**SAARSTAHL, AG, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Inland Steel Bar Co., Defendant–Intervenor.**

Court Number 93–04–00219.
Slip Op. No. 94–92.
United States Court of
International Trade.

June 7, 1994.

Grunfeld, Desiderio, Lebowitz & Silverman (Bruce M. Mitchell, Max F. Schutzman, David L. Simon, Phillip S. Gallas, Andrew B. Schroth and Jeffrey S. Grimson), New York City, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Civ. Div., Commercial Litigation Branch, U.S. Dept. of Justice (Jeffrey Telep), Marguerite E. Trossevin, Atty.–Advisor, Office of Chief Counsel for Import Admin., Washington, DC, for defendant.

Wiley, Rein & Fielding, Charles Owen Verrill, Jr., Alan H. Price, Willis S. Martyn, III, Peter S. Jordan, Beth A. Kurowski, Jacqueline A. Jones and Brian E. Rosen, Washington, DC, for defendant-intervenor.

## Opinion

CARMAN, Judge:

Plaintiff and defendant-intervenor contest the U.S. Department of Commerce's (Commerce) determination in *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed.Reg. 6233 (Dep't Comm.1993) (final determination) (*Final Determination* ), as modified by *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany* (Dep't Comm.1993) (*Remand Determination* ). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (1988).

### Background

Commerce's period of investigation for Saarstahl AG is calendar year 1991. *Final Determination,* 58 Fed.Reg. at 6233. The products covered by Commerce's investigation are "hot-rolled bars and rods of nonalloy or other alloy steel, whether or not descaled, containing by weight 0.03 percent or more of lead or 0.05 percent or more of bismuth, in coils or cut lengths, and in numerous shapes and sizes." *Id.*

Between 1978 and 1985, Saarstahl, which went through various mergers, restructurings and name changes, received a total of DM 3.948 billion in subsidies from the Saarland state and German federal governments. *Id.* at 6233–34. The Saarland and federal governments provided Saarstahl and its corporate predecessors with loan guarantees and "RZVs." RZVs are loans provided by the German government, the face value of which must be repaid by the recipient. In Saarstahl's case, the repayment of the RZVs was contingent upon the company's return to profitability. *Id.* at 6234. When Saarstahl could not make principal payments on the guaranteed loans, the two governments assumed the company's interest and principal payments. *Id.* In exchange for this funding, Saarstahl continued to amass RZVs.

In 1989, Dillinger Hütte Saarstahl AG (DHS), a holding company, purchased Saarstahl after requiring (1) the Saarland and federal governments to assume certain debt and forgive outstanding RZVs; (2) private lenders to forgive debt amounting to DM 217.1 million; and (3) Saarstahl to reorganize its capital structure. *Id.* at 6234–35. The Saarland government contributed the assets of Saarstahl and DM 145.1 million in cash in exchange for 27.5% ownership of DHS. *Id.* at 6234. The majority owner of DHS, the French-owned Usinor Sacilor, contributed its shares of Dillinger Huttenwerke and received 70% of DHS. A third participant, ARBED Luxembourg, purchased 2.5% of DHS for DM 8.9 million.

Pursuant to a petition filed by Inland Steel Corporation and Bethlehem Steel Corporation, Commerce initiated an investigation on May 8, 1992, and issued its preliminary determination on September 17, 1992. *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Brazil, France, Germany, and the United Kingdom,* 57 Fed.Reg. 19,884 (Dep't Comm.1992) (initiation notice); *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 57 Fed.Reg. 42,971 (Dep't Comm.1992) (prelim. determination). In its *Final Determination,* published on January 27, 1993, Commerce determined "[b]ecause the debt forgiveness was part of the deal negotiated to effect the merger, we consider the forgiveness to benefit the newly-formed company, not the predecessor to DHS." *Final Determination,* 58 Fed.Reg. at 6236–37. Additionally, Commerce determined the forgiveness of debt by the private banks "was countervailable because it was required by the governments as part of a government-led debt reduction package for Saarstahl and because the two governments guaranteed the future liquidity of Saarstahl, thereby, implicitly assuring the private banks that the remaining portion of Saarstahl's outstanding loans would be repaid." *Id.* at 6235. Subsequent to the International Trade Commission's affirmative injury determination, Commerce issued a countervailing duty (CVD) order for the relevant products. *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed.Reg. 15,325 (Dep't Comm.1993) (CVD order).

Prior to briefing, Commerce requested and was granted a remand to reconsider its original determination. On remand, Commerce adopted its reasoning from *Certain Steel Products from Germany,* 58 Fed.Reg. 37,315 (Dep't Comm.1993) (final determination). Commerce determined the debt forgiveness amounted to a grant bestowed upon Saarstahl in 1991, the benefit of which passed through to DHS after Saarstahl was privatized. *Remand Determination* at 6. Commerce also determined part of the Saarstahl sales price represented repayment of the subsidy and adjusted the CVD margins accordingly. *Id.* at 5–6. In the original final determination Commerce found CVD margins of 17.28%, and in the subsequent remand determination Commerce found CVD margins of 16.85%. *Final Determination,* 58 Fed.Reg. at 6237; *Remand Determination* at 8.

### CONTENTIONS OF THE PARTIES

A. *Saarstahl AG v. United States*

Saarstahl argues Commerce erroneously found Saarstahl's subsidies survived privatization. Saarstahl contends Commerce should have valued the forgiveness of the RZVs at zero or, in the alternative, allowed a greater portion of the purchase price to be considered repayment of past subsidies. Ad-

ditionally, Saarstahl asserts Commerce mischaracterized the subsidies as the forgiveness of long-term, contingent-liability, interest-free loans. According to Saarstahl, they should be treated as grants or equity. With respect to the forgiveness of interest and principal by private banks, Saarstahl claims there is no record evidence supporting the conclusion this forgiveness is a countervailable subsidy.

Commerce argues its determination that subsidies survive privatization, which is based on its new privatization policy, is supported by substantial evidence on the record and is in accordance with law. Because Saarstahl was obligated to repay the face value of the RZVs, Commerce contends this was the appropriate valuation of the subsidy received. Furthermore, Commerce maintains because the underlying subsidy was a loan, the forgiveness was of an obligation arising from a debt instrument not a grant and was properly countervailed from the time of forgiveness. Based on the evidence of the governments' significant role in the private banks' debt forgiveness, Commerce claims it reasonably determined the forgiveness was an indirect benefit from the governments and therefore countervailable.

Inland maintains Commerce properly determined the subsidies travelled with Saarstahl to its new home and argues Saarstahl has failed to demonstrate Commerce's reasoning is unlawful. Additionally, Inland contends Commerce properly valued the RZVs based on that which Saarstahl directly or indirectly received instead of face value. According to Inland, Saarstahl has no grounds to complain about the characterization of the RZVs because Saarstahl carried them on its books as liabilities until the governments forgave them in 1989. Finally, Inland agrees with Commerce's finding the private banks' forgiveness was countervailable due to the involvement of the Saarland and federal governments.

B. *Inland Steel Bar Co. v. United States*

Inland argues Commerce improperly treated subsidies received only by Saarstahl as benefitting products produced by DHS's other subsidiary, Dillinger. Inland also contends Commerce failed to make a final determination regarding Saarstahl's creditworthiness in 1989. Inland further maintains Commerce acted unlawfully in retroactively applying its new privatization methodology and Saarstahl thus has no basis for obtaining an offset to its subsidies. Moreover, according to Inland, because the Saarland government actually overpaid for its share of DHS by DM 62.5 million, there was no subsidy repayment. Finally, Inland asserts there was no privatization of Saarstahl because the Saarland government held veto power and because the three owners of DHS are themselves state-owned companies.

Commerce claims it properly determined Dillinger benefitted from Saarstahl's subsidies because the forgiveness of debt was not tied to the production of any specific product and was a general benefit to Saarstahl which travelled to DHS as a benefit to the entire company. Commerce argues it was lawful to apply its new privatization methodology to Saarstahl and that it correctly applied the methodology. Despite Inland's arguments to the contrary, Commerce maintains it properly concluded Saarstahl was privatized. With respect to Saarstahl's creditworthiness in 1989, Commerce requests a remand to review this point to determine whether a risk premium is necessary. Commerce also requests a remand to review the price Usinor Sacilor paid for its share of DHS.

## STANDARD OF REVIEW

The appropriate standard for the Court's review of a final determination by Commerce is whether the agency's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana S.A. v. United States*, 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986), *aff'd*, 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted).

The Court must accord substantial weight to the agency's interpretation of the statute it administers. *American Lamb Co.*

*v. United States,* 4 Fed.Cir. (T) 47, 54, 785 F.2d 994, 1001 (1986) (citations omitted). While Commerce has discretion in choosing one methodology over another, "[t]he traditional deference courts pay to agency interpretations is not to be applied to alter the clearly expressed intent of Congress." *Board of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.,* 474 U.S. 361, 368, 106 S.Ct. 681, 685–86, 88 L.Ed.2d 691 (1986), *cited in British Steel Corp. v. United States,* 10 CIT 224, 235, 632 F.Supp. 59, 68 (1986); *see also Ceramica Regiomontana,* 10 CIT at 405, 636 F.Supp. at 966 (The agency must not "contravene or ignore the intent of the legislature or the guiding purpose of the statute.") (citations omitted).

## DISCUSSION

### A. *Attribution of Subsidies to DHS*

▪ There is no dispute that a subsidy within the meaning of 19 U.S.C. § 1677(5) (1988) was bestowed upon Saarstahl. The threshold issue before the Court is whether Commerce properly determined subsidies previously bestowed upon Saarstahl could be attributed to DHS after DHS acquired Saarstahl in an arm's length transaction from the Saarland state and German federal governments. If such attribution is unlawful, then no countervailable event has occurred pursuant to 19 U.S.C. § 1671(a) (1988). For purposes of addressing this issue, the Court will assume the forgiveness of debt by the governments and private banks constituted countervailable benefits and will refrain from addressing Saarstahl's arguments to the contrary. For the reasons which follow, the Court holds Commerce erred as a matter of law in determining subsidies previously bestowed upon Saarstahl can be attributed to DHS.

In 1993 Commerce developed and published a methodology for analyzing the privatization of some or all of a government-owned company. General Issues Appendix, 58 Fed. Reg. 37,225, 37,259 (Dep't Comm.1993). Commerce stated CVD law required it "to countervail an allocated share of the subsidies received by producers, regardless of their effect." *Id.* at 37,260. According to Commerce, therefore, it is irrelevant "whether subsidies confer a demonstrable competitive benefit upon their recipients, in the year of receipt or any subsequent year." *Id.* In rejecting arguments that privatization automatically extinguishes prior subsidies, Commerce concluded such argument are contrary to CVD law because

> the countervailable subsidy (and the amount of the subsidy to be allocated over time) is fixed at the time the government provides the subsidy. The privatization of a government-owned company, *per se,* does not and cannot eliminate this countervailability.... [T]he statute does not permit the amount of the subsidy, including the allocated subsidy stream, to be reevaluated based upon subsequent events in the marketplace.

*Id.* at 37,263.

▪ Based on Commerce's methodology, privatization does not extinguish subsidies, but "[i]nstead, some portion of prior subsidies received by the seller 'travel[s] (with the productive unit) to its new home.'"[1] *Id.* at 37,268. Despite maintaining CVD law does not permit it to determine how subsequent events affect the subsidy stream, Commerce stated it "will analyze the spin-off and acquisition of productive units to assess what portion of the sale price of the productive unit repays prior subsidies given to the seller of the productive unit." *Id.* at 37,269.

The thrust of Commerce's argument is that Saarstahl's subsidies travelled with it to its new home at DHS. According to Commerce, the benefit passes through to subsequent purchasers "in the absence of any evidence showing the subsidy went anywhere else." Transcript (Tr.) at 27. Commerce concluded "DHS as a whole benefitted when it received the subsidized Saarstahl.... Since DHS paid for Saarstahl, it is DHS that received the subsidies that were not repaid."

---

**1.** Commerce established a minimum threshold for allocating subsidies because it determined it would be administratively infeasible to allocate subsidies to each individual asset. "In order to be considered a productive unit, the spun-off operation must be capable of (1) generating sales and (2) operating independently." *Id.* at 37,268.

*Remand Determination* at 9. Based on its privatization methodology, Commerce stated subsidies will only be extinguished "to the extent that a portion of the purchase price for a privatized company can reasonably be attributed to prior subsidies." *Remand Determination* at 10 (citing General Issues Appendix, 58 Fed.Reg. at 37,262–63). Because it maintains it is not required to look at subsequent events once it determines a subsidy has been bestowed, Commerce argues it reasonably determined subsidies given to Saarstahl traveled with it to its new home, DHS, where they provided a countervailable benefit to DHS.

Before a CVD can be imposed, Commerce and the International Trade Commission (ITC) must make certain findings. Once Commerce determines that

> **(A)** a country under the Agreement, or
>
> **(B)** a person who is a citizen or national of such a country, or a corporation, association, or other organization organized in such a country,
>
> is providing, directly or indirectly, a subsidy with respect to the manufacture, production, or exportation of a class or kind of merchandise imported, or sold
>
> > (or likely to be sold) for importation, into the United States, and [the ITC makes an affirmative injury determination],
>
> then there shall be imposed upon such merchandise a countervailing duty, in addition to any other duty imposed, equal to the amount of the net subsidy.

19 U.S.C. § 1671(a). In determining whether a given item is a subsidy, Commerce is guided by 19 U.S.C. § 1677(5)(A). Absent a finding that a subsidy within the meaning of § 1677(5)(A) is being provided, directly or indirectly, no CVD can be assessed pursuant to § 1671(a). Because the parties agree no subsidy was provided directly to DHS, the remaining question is whether DHS indirectly received the benefits of Saarstahl's previously bestowed subsidies.

Saarstahl was privatized in an arm's length transaction which involved a change of ma-

jority ownership and control to an unaffiliated corporation. *See* Tr. at 19 (In response to the Court's question "was this an arm's length transaction," the government responded, "Yes, it was."); *Final Determination,* 58 Fed.Reg. 6235, 6236. Commerce determined the Saarland government's

> capital contribution of DM 145.1 million ... *to be consistent with commercial considerations.* At the same time that the Saarland government was investing these funds, two private investors were also investing in DHS. Using these private investors as a benchmark, we find that the Government of Saarland made its investment on the same terms.

*Final Determination,* 58 Fed.Reg. at 6235 (emphasis added). Commerce reiterated its finding of an arm's length transaction:

> We believe that the equity infusion made by the Government of Saarland into DHS was on *terms consistent with commercial considerations.* Because there were other investors besides the Government of Saarland, the terms of the other investors, rather than the financial performance of the recipient company, determine whether the government investment was made on terms consistent with commercial considerations. Moreover, the fact that there were private parties willing to invest in DHS supports the conclusion that the company is equityworthy. Therefore, because ... ARBED and Usinor Sacilor, made equity infusions at the same time and on the same terms as the Government of Saarland, we determine that the equity infusion made by the Government of Saarland into DHS was made *on terms consistent with commercial considerations.*

*Id.* at 6236 (emphasis added).[2]

■■ An arm's length transaction is "a transaction negotiated by unrelated parties, each acting in his or her own self interest" and is "the basis for a fair market value determination." BLACK'S LAW DICTIONARY 109 (6th ed. 1990). Fair market value, in turn, is defined as "[t]he amount at which property would change hands between a will-

---

**2.** In addition to Commerce's finding the sale of Saarstahl to be on an arm's length transaction, an independent accounting firm (KPMG) also

determined the Saarland government paid a fair price for its investment in DHS. *See id.*

ing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." *Id.* at 597. Where a determination is made a given transaction is at arm's length, one must conclude that the buyer and seller have negotiated in their respective self-interests, the buyer has taken into consideration all relevant facts, and the buyer has paid an amount which represents the market value of all it is to receive. Because the countervailable benefit does not survive the arm's length transaction, there is no benefit conferred to the purchaser and, therefore, no countervailable subsidy within the meaning of 19 U.S.C. § 1677(5). The purchaser, thus, will not realize any competitive countervailable benefit and any countervailable duty assigned it amounts to a penalty. *See, e.g., Zenith Radio Corp. v. United States,* 437 U.S. 443, 455–56, 98 S.Ct. 2441, 2448, 57 L.Ed.2d 337 (1978) (The statutory "purpose is relatively clear from the face of the statute and is confirmed by the congressional debates: The countervailing duty was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments.") (citation omitted).

■ Commerce categorically disclaims responsibility for analyzing the impact of subsequent events on the subsidy stream. *See* General Issues Appendix, 58 Fed.Reg. at 37,-260. While the Court agrees with Commerce that the CVD law "embodies the irrebuttable presumption that subsidies confer a countervailable benefit upon goods produced by their recipients," such a presumption ceases to exist where the new owner has paid fair market value for the productive unit and is therefore not a "recipient." *See id.* The Court is not requiring Commerce to determine the actual use to which recipients put the subsidies or the subsidies' effect on the company's subsequent performance. Nor is the Court demanding Commerce "undertake a remeasurement of the effect of previously bestowed subsidies" when a productive unit is sold. *See* Government's Response Brief at 43. What the Court is requiring is that Commerce pay heed to the legislative intent of the CVD laws.

Furthermore, in calculating the *ad valorem* effect of non-recurring subsidy grants or loans, reasonable methods of allocating the value of such subsidies over the production or exportation of products benefitting from them will be used. Such methods should include *relating the benefit of the commercial advantage to the recipient,* or relating the value of a subsidy for acquiring assets to their anticipated useful life, based on generally accepted accounting principles.

H.R.REP. No. 317, 96th Cong., 1st Sess. 75 (1979) (emphasis added); *see also* S.REP. No. 249, 96th Cong., 1st Sess. 85–86 (1979) (Methods for allocating the value of non-recurring subsidy grants or loans must be "based on the *commercial and competitive benefit to the recipient as a result of the subsidy.*") (emphasis added).

A simple example will illustrate the faulty reasoning behind Commerce's travelling subsidy theory. A government gives X a productive unit, a printing press operation, and X subsequently sells that printing press operation to Y in an arm's length transaction. Instead of owning the printing press operation, X will now have the cash value of that operation. According to Commerce, at least a portion, if not all, of the original subsidy will travel with the printing press operation to Y. When both X and Y export their goods to the U.S., Y will have to pay a countervailable duty while X will have to pay either no countervailable duty or a reduced duty (depending on what portion of the subsidy Commerce determines travelled with the productive unit). X will have essentially evaded the CVD laws and be in a position to export to the U.S. on an uneven playing field.

■ Where a productive unit which previously received subsidies is sold in an arm's length transaction, the subsidy is not extinguished, it remains with the seller. If in this arm's length transaction the company is completely sold, the subsidy remains with the shareholders upon dissolution of the corporation. Where the sole shareholder is the government and the company is completely sold in an arm's length transaction, the subsidy reverts to the state. To the extent the government is not fully reimbursed for its previ-

ous subsidy payments, the subsidy is extinguished. Once Commerce determines a transaction is an arm's length transaction, who the seller is is irrelevant. The sale of a productive unit by a government should be treated no differently than one sold by private parties *as long as Commerce has determined the sale was an arm's length market transaction.* The purpose of the CVD laws is not to capture somehow a subsidy once it is bestowed. The purpose is to assess countervailing duties against those goods entering the U.S. on an uneven playing field. *See e.g., British Steel Corp. v. United States,* 9 CIT 85, 95, 605 F.Supp. 286, 294 (1985) (citing *Nicholas & Co. v. United States,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919); *Downs v. United States,* 187 U.S. 496, 23 S.Ct. 222, 47 L.Ed. 275 (1903)) ("Significantly, the CVD law concerns itself not with the government's purpose or intent in a particular program, *but whether the government's funds give the country's exports an unfair competitive advantage.*") (emphasis added).

If Commerce were allowed to pursue its theory, the impact on commercial activity would be immeasurable. A finding of an "arm's-length transaction" would lose all meaning because there would continue to be a stigma attached to the purchased productive unit or business. According to Commerce's theory, it would not matter how many times the business is sold in an arm's length transaction—as long as the amortization clock is still ticking the subsidy will continue to travel. Such a theory imposes a heavy burden on commercial transactions as it effectively requires buyers to value the potential liability of purchasing productive units which previously received a subsidy. A purchaser could no longer value a business based on market considerations; he would have to investigate whether there had been previous subsidies that were being, or possibly might be, countervailed in the future. The burden would be especially onerous where a productive unit which had received subsidies and never exported to the U.S. under prior ownership begins such exporta-

tion. It is quite possible that a subsidized corporation could, in an arm's length transaction, sell off the entire portion of its business which exports products to the U.S. If that corporation no longer exports to the U.S., the amount of its past and present subsidies are of no consequence to Commerce. The subsidies are only relevant if that corporation continues to export or at some future date resumes exporting to the U.S.

Commerce did not find in either the *Final Determination* or *Remand Determination* that a discount was granted in the purchase price due to previously bestowed subsidies. In fact, it would have been unusual for the parties to have contemplated such a discount given the merger took place in 1986 and Commerce did not develop its new methodology until 1993. By determining the sale of Saarstahl was at arm's length, Commerce has necessarily determined DHS did not receive a competitive benefit, but instead paid the fair market value for the productive unit it purchased. In the instant case, Commerce has thus failed to "relate the benefit of the commercial advantage to the recipient," and has ignored the legislative intent as a result. *See Ceramica Regiomontana,* 10 CIT at 405, 636 F.Supp. at 966. Commerce has developed its privatization methodology in the absence of any direction by Congress [3] and in direct contravention of the guiding purpose of the CVD laws. Accordingly, the Court holds Commerce has erred as a matter of law and the *Final Determination* as modified by the *Remand Determination* is vacated to the extent Commerce determined previously bestowed subsidies are passed through to a successor company in an arm's length transaction.

### B. *Privatization of Saarstahl*

The final argument the Court will address is Inland's contention that the sale of Saarstahl to DHS was not a privatization, but rather various government entities merely combining their assets. According to Inland, no privatization arose because the Saarland

---

**3.** Commerce in fact concedes Congress has provided it with no guidance in assessing privatization issues. *See* General Issues Appendix, 58 Fed.Reg. at 37,263 ("There is no guidance in the statute, legislative history, or case law as to what proportion of the purchase price of a privatized company should be attributed to prior subsidies.")

government maintained blocking power over the activities and operations of Saarstahl through its 27.5% stock ownership and the other stock owners are themselves state-owned companies. Additionally, Inland argues Germany, France (owner of Usinor–Sacilor), and Luxembourg (owner of ARBED) should be treated as one country for CVD law purposes because they are part of the same customs union. If the three owners of DHS are viewed as a single country, then Inland claims Commerce unreasonably concluded Saarstahl was privatized.

Inland's position is unpersuasive. The veto power apparently arises automatically under German law where a shareholder owns more than 25% of the outstanding shares and may only be exercised over amendments to the certificate of incorporation and resolutions concerning the capital structure of the company. The fact the Saarland government has certain veto power through its 27.5% interest in DHS, therefore, does not render Commerce's conclusion Saarstahl was privatized unreasonable or unlawful. *See, e.g., Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.") (citations omitted).

Resolution of Inland's second argument, that the foregoing countries should be treated as a single country for CVD law purposes, depends upon the application of 19 U.S.C. 1677(3) (1988). Section 1677(3) provides as follows:

> The term "country" means a foreign country, a political subdivision, dependent territory, or possession of a foreign country, and, except for the purposes of antidumping proceedings, *may include* an association of 2 or more foreign countries, political subdivisions, dependent territories, or possessions of countries into a customs union outside the United States.

(emphasis added). The Court must assess whether Commerce's interpretation of this statute as applied to the instant case is unreasonable. *See U.H.F.C. Co. v. United States,* 9 Fed.Cir. (T) 1, 10, 916 F.2d 689, 698 (1990) ("It is well settled that an agency's interpretation of the statute it has been entrusted by Congress to administer is to be upheld unless it is unreasonable.") (citations omitted). From the use of permissive language in section 1677, it is clear this section does not mandate Commerce to consider countries within a customs union as one country for CVD purposes. Furthermore, in the instant case, the European Union did not provide any subsidies and both Usinor–Sacilor and ARBED acted as private parties. Accordingly, the Court holds Commerce reasonably interpreted the CVD laws and considered ARBED and Usinor–Sacilor private parties in concluding Saarstahl was privatized.

Commerce has requested the Court remand this matter to review the agency's allocation of Saarstahl's purchase price to repayment of prior subsidies and to assess Saarstahl's creditworthiness in 1989. Because each of these recalculations pertains to the privatization methodology which the Court holds to be unlawful as applied to companies privatized in arm's-length transactions, the Court declines to remand. Moreover, as the Court holds Commerce unlawfully concluded Saarstahl's subsidies travelled to DHS, the Court need not address the parties other arguments.

## CONCLUSION

Having considered all of the parties' arguments in this consolidated action, the Court holds (1) Commerce's determination that Saarstahl was privatized is based on substantial evidence on the record and is otherwise in accordance with law, and (2) Commerce's privatization methodology, to the extent it states previously bestowed subsidies are passed through to a successor company sold in an arm's length transaction, is unlawful. Commerce's request for remand is denied and Inland Steel's motion is denied in all respects. Judgment is for plaintiff Saarstahl AG.

## ORDER

This case having been duly submitted for decision and this Court, after due delibera-

196

tion, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that *Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany,* 58 Fed.Reg. 6233 (Dep't Comm. 1993) (final determination), as modified by *Remand Determination: Certain Hot Rolled Lead and Bismuth Carbon Steel Products From Germany* (Oct. 12, 1993) is vacated, to the extent Commerce determined previously bestowed subsidies are passed through to a successor company sold in an arm's length transaction; and it is further

ORDERED that Commerce's request for remand is denied; and it is further

ORDERED that Inland Steel's motion is denied in all respects; and it is further

ORDERED that judgment is for plaintiff Saarstahl AG.